**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charissa Dawn Wilson, | No. CV-18-00150-TUC-EJM |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Charissa Dawn Wilson brought this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Plaintiff raises four[1] issues on appeal: 1) the Administrative Law Judge ("ALJ") erred by failing to include substantial evidence of Plaintiff's impairments at Step Two; 2) the Vocational Expert ("VE") stated that Plaintiff could not maintain competitive employment; 3) the ALJ failed to adequately develop the record by not obtaining or properly submitting materially relevant evidence from Plaintiff's treating physicians that Plaintiff produced, therefore Plaintiff was prejudiced by an incomplete medical record; and 4) the ALJ failed to give adequate weight to the diagnostic findings of Plaintiff's treating physicians. (Doc. 26).

Before the Court are Plaintiff's Opening Brief, Defendant's Response, and

---

[1] The Court lists these issues as Plaintiff stated them in her opening brief. Defendant restates the issues differently in the Response; however, the Court declines to address issues that Plaintiff herself did not actually raise. *See Schopp v. Colvin*, 2014 WL 4722524, at *4 (D. Or. Sept. 22, 2014) ("A plaintiff challenging the Commissioner's final decision regarding disability must specifically and directly argue issues in his or her opening brief.").

Plaintiff's Reply. (Docs. 26, 28, & 29). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that the Commissioner's decision should be affirmed.

## I. Procedural History

Plaintiff filed an application for social security disability benefits on September 3, 2014. (Administrative Record ("AR") 129). Plaintiff alleged disability beginning on November 1, 2013 based on musculoskeletal disorder, depression, anxiety, PTSD, kidney disease, osteoarthritis, polyneuropathy, and Reynaud's. (AR 57). Plaintiff's application was denied upon initial review (AR 71) and on reconsideration (AR 91). A hearing was held on January 4, 2017 (AR 28), after which ALJ MaryAnn Lunderman found, at Step Five, that Plaintiff was not disabled because there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (AR 22–23). On January 18, 2018 the Appeals Council denied Plaintiff's request to review the ALJ's decision. (AR 1).

## II. Factual History[2]

Plaintiff was born on June 24, 1984, making her 29 years old at the alleged onset date of her disability. (AR 57). She received a GED and has worked a number of jobs including receptionist, busser, hostess, call center, cocktail waitress, front desk, and housekeeping. (AR 33–38, 148).

### A. Treating Physicians

On May 2, 2009 Plaintiff was treated for pyelonephritis (a kidney infection). (AR 390).

On September 10, 2013 Plaintiff reported urinary problems, mild to moderate and occurring rarely, and lower back pain, moderate to severe. (AR 209). She had a normal exam of the lumbar spine with no compression fracture or spondylolisthesis. (AR 208).

---

[2] While the undersigned has reviewed the entirety of the record in this matter, the following summary includes only the information most pertinent to the Court's decision on Plaintiff's claims on appeal.

On September 25, 2013 Plaintiff reported a history of kidney infection, bilateral hip pain from a short leg, popping joints, right wrist and knee swelling, chronic severe joint pain especially in neck and back, history of fainting and frequent migraines, and history of depression. (AR 238). Exercise helps but she had not exercised in a year. On exam she had normal movement of all extremities, no abnormalities, and no swelling, but complained of pain everywhere with palpation. (AR 240–41). The assessment was urethritis, arthritis, and depression, and Plaintiff was referred for lab work and x-rays. (AR 238–39).

On September 26, 2013 an x-ray of the hips showed right femoral herniation pit raising concern for femoral acetabular impingement. (AR 236).

On October 11, 2013 Plaintiff reported she was doing fantastic on Cymbalta and physically her pain improved substantially. (AR 234). The assessment was chronic pain and depression and exercise or yoga was recommended.

On June 6, 2014 Plaintiff presented to SAMHC for a crisis consult for severe depression and anxiety attacks. (AR 214). Plaintiff reported struggling with depression, going home from work and crying, and not being able to keep a job. (AR 215). The impression was depressive disorder NOS and Plaintiff was referred to La Frontera. (AR 217).

On August 6, 2014 Plaintiff had an assessment at La Frontera. (AR 275). Plaintiff reported leaving her last four jobs because of mental health issues and described uncontrollable crying, feeling down, hopeless, and sad, anxiety, and nightmares and flashbacks about past trauma. The diagnosis was major depressive disorder, recurrent moderate, and posttraumatic stress disorder, with a GAF score of 51. (AR 278).

On August 19, 2014 an x-ray of the spine showed minimal degree scoliosis and bilateral transverse mega-apophysis at a transitional lumbosacral vertebral body. (AR 231). A scanogram of the legs showed age appropriate bone mineralization, synovial herniation pit in the right femoral neck, and the left leg length was longer. (AR 230).

On August 21, 2014 Plaintiff reported flares of aches and pains in her joints and

muscles. (AR 227). Imaging showed minimal scoliosis and right[3] leg was 1.1 cm longer than the left. The assessment was lumbago; there was no clear indicator of what was causing Plaintiff's pain and she was referred to rheumatology.

On September 30, 2014 Plaintiff had a new client medication evaluation appointment at La Frontera. (AR 295). On exam she was pleasant and cooperative, tearful at times, normal gait and station, normal muscle strength and tone, good attention span and concentration, and appropriate affect. (AR 296). Plaintiff was prescribed Hydroxyzine for anxiety.

On October 21, 2014 Plaintiff saw Dr. Yekta to establish a PCP and reported a history of recurrent pyelonephritis, Raynaud's, depression/anxiety, chronic back pain, and muscle pain. (AR 245). Plaintiff also reported left calf pain radiating to her hip and right wrist and shoulder pain. (AR 246). On exam she was tearful and anxious appearing, extremities nontender and full ROM without swelling of the joints, slight crepitus in right shoulder and knees, and full ROM and nontender spine. (AR 247).

An ultrasound on November 10, 2014 showed no hydronephrosis. (AR 254).

On November 10, 2014 Plaintiff saw Dr. Yekta for a follow-up. (AR 250). All lab work for kidneys and possible autoimmune issues was normal. (AR 250–251, 253). Plaintiff reported muscle and bone pain, pain causing her to wake up at night for 1–3 hours, low energy, tiredness, and unable to exercise due to pain. (AR 251). On exam she was tearful, anxious, and depressed, extremities full ROM without swelling of the joints, and slight crepitus in right shoulder. (AR 252). Plaintiff was referred to PT and sports medicine for her joint and muscle pain, and Dr. Yekta noted that her autoimmune workup was completely negative, but per the diagnostic criteria of fibromyalgia, there was a high possibility of diagnosis. (AR 253). Plaintiff was prescribed Amitriptyline.

X-rays of the hands on November 20, 2014 were normal. (AR 256).

On December 1, 2014 Plaintiff told La Frontera that everything was pretty good, that she stopped the healthy living group, was attending PT, and was prescribed

---

[3] The Court notes that this is likely an error, as imaging results showed Plaintiff's left leg was longer.

Amitriptyline for nerve pain and it helped her depression. (AR 341).

On January 22, 2015 Plaintiff saw Dr. Buchsbaum for leg problems, myalgia, and anxiety. (AR 369). The diagnosis was muscle pain, joint pain, depression, history of pyelonephritis, and Raynaud's. On exam she had normal muscle strength in all extremities with mild diffuse atrophy and weakness in the right leg. (AR 370). The impression was congenital hemiatrophy and anxiety.

On February 26, 2015 Plaintiff saw Dr. Buchsbaum and had normal muscle strength in all extremities with mild diffuse atrophy and weakness in the right leg. (AR 368). The impression was hemiatrophy, anxiety, and multiple presyncopal episodes, and the plan was a scan of the spine to make sure the findings were static cord findings from early childhood.

A March 23, 2015 MRI of the cervical spine showed mild degenerative disc disease at C6–C7 but was otherwise normal. (AR 383). A MRI of the thoracic spine was normal. (AR 385).

On April 2, 2015 Dr. Buchsbaum noted there was no answer image wise for Plaintiff's hemiatrophy so they discussed it as congenital and would order electrical studies to prove it was not active or progressive. (AR 382).

A May 22, 2015 nerve conduction study was normal with no evidence of mononeuropathy, LS radiculopathy, peripheral neuropathy, or myopathy. (AR 430).

A June 11, 2015 MRI of the head showed: "Tiny curvilinear focus of signal hyperintensity in the left periventricular white matter. This may be related to small vessel ischemic change but is nonspecific. Appearance is not typical for demyelinating disease." (AR 415). The remainder of the brain was unremarkable.

An August 13, 2015 MRI of the lumbar spine showed sacralization of the L5 vertebral body and mild degenerative changes of the lumbar spine. (AR 411).

On October 2, 2015 Plaintiff was referred to physical therapy and the pain clinic for her lower back pain. (AR 443–444).

On October 2, 2015 Plaintiff's problem list included: muscle pain, joint pain,

depression, history of pyelonephritis, Raynaud's phenomenon, muscle atrophy, weakness, muscle wasting and atrophy lower right leg, muscle spasticity, hyperreflexia, congenital hemihypertrophy, other congenital abnormality of the spine, and Bertolotti's syndrome. (AR 471–472 ).

On November 5, 2015 Plaintiff saw Dr. Bamford and he noted the following:

> Plaintiff has numerous exaggerated complaints. I had to speak to her and tell her that her complaints were unreasonable and unrealistic. She responded that she had to exaggerate to get the point across said that people were taken seriously [*sic*].

> The patient claimed the following complaints: She has to call [*sic*] to swallow. She used to choke. She says that it takes 1 minute for her to hear what someone is saying. She says that both of her arms are symmetrically weak. She says that her legs are weak and the right leg is weaker . . . her legs go numb if she crosses her legs . . . She has constant low back pain [and] constant severe neck pain.

(AR 501). Dr. Bamford stated that Plaintiff had "[n]umerous subjective symptoms with relatively few objective signs," and that the severity of her problems was "unclear" with "probable exaggeration." On exam she had normal strength of all extremities; tone slightly increased in right lower extremity and normal in the remaining three; normal sensation and coordination; and mild right hemiparetic gait. (AR 502). The impression was probable mild cerebral palsy; hypochondriasis, exaggeration, unreliable historian, and tangential; she wants to be believed but knowingly exaggerates for effect; small right L5 perineural cyst, probably asymptomatic; and mild cervical degenerative disc disease, probably asymptomatic.

A genetic report dated December 8, 2016 was negative and stated no clinically relevant alterations detected; there were two unique gene alterations of unlikely clinical relevance. (AR 489, 491). The secondary findings report was also negative with no clinically relevant alterations detected. (AR 497).

On December 23, 2016 Plaintiff saw Dr. Laukaitis for a follow-up with diagnoses of carrier of genetic disorder, congenital hemihypertrophy, and spine anomaly. (AR 486).

On February 16, 2017 Plaintiff saw Dr. Bamford and complained of numbness in

arms, leg muscles tight and painful, pain in back, neck, and shoulder, headaches, and dizziness. (AR 505). Dr. Bamford noted "[n]umerous subjective symptoms with relatively few objective signs" and that the severity was "unclear" because Plaintiff admitted to exaggeration to get her point across. On exam she did not listen and could not be reassured about anything, talked over the doctor, was argumentative and inattentive, had dramatic effect, and was crying from frustration. (AR 506). Plaintiff had normal strength in all four extremities, normal tone in arms and increased in legs, normal sensory function and coordination, and walked with a spastic right leg. The impression was: "Spasticity, hyperreflexia. These are objective neurological signs. Probable mild cerebral palsy. Hypochondriasis, exaggeration, unreliable historian, tangential. As a historian, she is her own worst enemy, she wants to be believed but she knowingly exaggerates for effect. Small right L5 perineural cyst, probably asymptomatic. Mild cervical degenerative disc disease, probably asymptomatic." The plan was "none."

### B. Consulting Physician

On May 11, 2015 Plaintiff saw Dr. Sloan King for a psychiatric consultation. (AR 422). Plaintiff was initially somewhat irritable and thought the referral was for a neurologist, not a psychologist. She reported a significant history of neurological issues but there was no medical information available to corroborate her self-report. (AR 423). Plaintiff described herself as sickly since childhood and stated she was diagnosed with fibromyalgia in November 2014, congenital hemiatrophy where her right leg is smaller than her left and painful, and polyneuropathy causing a tingling sensation in her hands. She also reported a diagnosis of Raynaud's as a teenager and that Dr. Buchsbaum was in the process of ruling out muscular dystrophy or myopathy. Plaintiff reported she can stand for hours on a good day but only a few minutes when she is in pain, and her ability to sit depends. She declined antidepressants but finds Hydroxyzine helpful for anxiety and sleep.

Regarding her mental status, Dr. Sloan observed:

> Ms. Wilson presented as a verbally articulate individual of at least low average to average or above intelligence, with a

somewhat incongruent affect in that she was often smiling and bright but then tearful at the same time when discussing what she believes are extensive health issues, although the medical documentation is absent and the support of her belief in her diagnoses is unclear. She reports thoughts of suicide . . . However, other symptoms were not consistent with a major depressive disorder but suggestive of personality disorder traits. Ms. Wilson currently reports extreme weakness and low energy, which she believes is "neurological." Her concentration is adequate, appetite variable but mostly normal, and her mood worrisome relative to her fear of neurological issues and "horrible genetic conditions."

. . .

She demonstrated no significant problems with cognitive functioning during the Mini Mental Status Exam, scoring 29 out of 30 points, placing her in the normal range.

(AR 426). Dr. Sloan's impression was somatic symptom disorder, persistent, severe, cannabis use disorder, mild to moderate, and problems related to unemployment. (AR 426). Dr. Sloan opined that Plaintiff did not have any limitations associated with her psychological diagnosis that would last for 12 continuous months, had the capacity to complete a normal workday and workweek without interruptions from psychologically based symptoms, and had good interpersonal skills. (AR 427).

C.    Plaintiff's Testimony

On a function report Plaintiff stated that she used to waitress but cannot hold up the trays and has tremors and issues with her legs, and lower back pain that makes her irritable. (AR 164). She can exercise 6 hours a day but it exhausts her; she has depression and crying spells. Her body wants her to sleep over 10 hours a night. (AR 165). She likes to cook, read, and draw, and does dishes, laundry, sweeping, and mopping. (AR 165–166, 168). She drives, can go out alone, and does her own shopping. (AR 167). Plaintiff stated her illness affects her ability to lift, squat, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others. (AR 169). She can walk a few steps to 1 mile, does not finish what she starts, follows written instructions really well but not spoken instructions, does not handle stress well but can handle changes in routine, and has trouble with authority

1   figures. (AR 169–170).

2       On a disability report dated February 20, 2015 Plaintiff reported a new medication

3   to alleviate nerve pain but that made her fatigued, and that her anti-anxiety medication

4   also had a strong fatigue effect. (AR 172). She reported increased depression, fatigue, and

5   stress, and new diagnoses of fibromyalgia and congenital hemihypertrophy. (AR 172–

6   173). Plaintiff stated she was too tired to work and the doctor said exercise was the only

7   option for her condition but she had no money for a gym membership. (AR 177). She had

8   extreme fatigue, intermittent episodes of severe pain in lumbar, pelvic, and shoulder

9   regions disturbing her sleep, and irritable mood affecting her social relationships. (AR

10  178). Plaintiff alleged that her hemihypertrophy was twisting her spine, pelvis, and rib

11  bones in a way that caused severe pain. (AR 179). Plaintiff complained about the quality

12  and speed of her medical care, stated that her doctor's office did not communicate her

13  November 2014 fibromyalgia diagnosis, and disputed that her pain and polyneuropathy

14  were resolved by medication. (AR 179–180).

15      On a function report dated March 26, 2015 Plaintiff reported extreme fatigue,

16  muscle weakness, severe muscle cramps, dizziness, fainting, shaking hands, excessive

17  sweating, and atrophy in right leg exacerbating hip and back pain and leading to

18  uncontrollable crying and irritability. (AR 184). On a good day she will eat, do dishes and

19  laundry, shower, read, and go for a walk, and on a bad day she is mainly in bed or on the

20  couch. (AR 185). She forces herself out of bed because she never feels rested and is

21  always exhausted. She used to be a gourmet cook but now just puts everything in a

22  blender and only cooks one or twice a week. (AR 186). She can do laundry, dishes, and

23  vacuum but never has energy to do so. (AR 187). Plaintiff stated she needed a cane but it

24  would probably take 6 months until she could talk to a doctor about it. (AR 190).

25      At the hearing before the ALJ, Plaintiff testified that she is bilingual, types well,

26  and has a lot of skills. (AR 33). She described a history of working various jobs for short

27  periods of time and then leaving the jobs due to workplace conflicts or medical problems.

28  (AR 33–38). Plaintiff testified that she  is unable to work because she is tired all the time

and constantly wants to sleep or lay down, she cries a lot, gets stressed and shakes, she drops things, she has problems with temperature regulation so she is constantly uncomfortable, in pain, and has recurrent urinary tract infections and needs frequent bathroom breaks. (AR 38–39). She takes Tizanidine for muscle spasms and to help her sleep, Valium if she is having a lot of anxiety and muscle stiffness, a hormone-regulating drug, and Lidocaine injections in her back once a month. (AR 39). On days when she takes all of her medications she is not functional.

Plaintiff testified that when she applied for disability benefits, she thought she just had fatigue and back pain and that her kidneys were starting to fail again, but she has cerebral palsy, multiple spine issues, and half her body is paralyzed. (AR 44). Dr. Bamford diagnosed her with a brain lesion and Dr. Dumont diagnosed her with six different kinds of spinal disease. She has an extra vertebra fusing her pelvis and cysts on her S1 nerve root. Plaintiff stated that she was referred to the National Institute of Health Rare Disease and Undiagnosed Disease Clinic and was waiting for her case to be submitted by her doctors. (AR 44–45).

Plaintiff testified that she can hold 25 pounds for about 15 minutes, but if she is having a bad day and everything hurts she can't lift anything at all. (AR 40). Depending on the day, she can sit for a long time, but she moves around a lot. (AR 41). Some days she can't get through a shower and some days she can stand for 4–6 hours, but then spends two or three days laying in bed. She can walk 1–2 blocks but can build up distance if she works at it. Plaintiff has 5 good days a month, 20 medium days, and 10 days where she is completely unwilling to move.

Plaintiff spends her days reading, studying law and medicine, drawing, doing some housework, and loves to cook but has trouble standing for 20–30 minutes to make a full meal. (AR 42).

D.    Lay Testimony

Plaintiff's friend John Vawser submitted a third-party function report dated November 30, 2014. He stated that Plaintiff cannot keep a schedule, all of her

relationships are in tension, she complains a lot about everything, and he thought she was faking it for awhile but has caught her crying by herself. (AR 156). Her "principles" often cause her to get fired from jobs or quit, she does not handle stress well, she is abnormally lazy/sleepy, and she is constantly stretching. (AR 157). Plaintiff has problems lifting, squatting, completing tasks, following instructions, and remembering. (AR 158). She reads and cooks daily (AR 159, 161), and complains she is in pain or physically incapable of doing housework (AR 160), but does cleaning, laundry, and dishes (AR 161).

E.     <u>Vocational Testimony</u>

At the hearing before the ALJ, Kathryn Atha testified as a vocational expert. She stated that Plaintiff's past jobs included order clerk, bar waitress, receptionist, cleaner/housekeeping, wire weaver, head waitress, dining room attendant, sales clerk, and informal waitress. (AR 46–47).

The ALJ asked Atha to assume an individual with the same age and educational background as Plaintiff with no functional limitations. (AR 47). Atha testified such a person could perform all of Plaintiff's past jobs.

For the second hypothetical, the ALJ added a limitation to medium exertion work limited to simple, routine tasks learned in 30 days or less, minimal change in the task as assigned, and no more than occasional superficial contact with coworkers, supervisors, and the public. (AR 47). Atha testified such a person could not do any of Plaintiff's past work but could do other jobs such as hand packager and floor waxer. (AR 48).

For the third hypothetical, the ALJ reduced the exertional level to light. (AR 48). Atha testified such a person could do Plaintiff's past work as a cleaner/housekeeper, and could also do other work such as garment folder, advertising material distributor, and sign holder. (AR 48–49).

Fourth, if the exertional level was reduced to sedentary, Atha testified such a person could not do any of Plaintiff's past work but could do other jobs including nut sorter, leaf tier, and plastic design applier. (AR 49).

On questioning by Plaintiff, Atha testified that if use of the right arm was limited to frequent, not constant, that would omit the nut sorter and plastic design applier jobs. (AR 51–52). A person could still perform the leaf tier job. If Plaintiff had to take more than a week off of work each month and would need to rest 50 percent of the time at work, Atha testified that she could not maintain competitive employment. (AR 54).

F.    ALJ's Findings

The ALJ found that Plaintiff had the severe impairments of a chronic pain and fatigue syndrome variously diagnosed, degenerative disc disease of the cervical and lumbar spines characterized as minimal to mild, and a mental impairment variously diagnosed to include depressive disorder and anxiety disorder. (AR 16). The ALJ found that Plaintiff's alleged recurrent urinary tract infections and kidney pyelonephritis were non-severe because there was no evidence that these conditions met the durational requirement of at least 12 continuous months and because they did not cause more than minimal limitations in the ability to perform basic work activities. (AR 16–17). The ALJ further found that Plaintiff's alleged cerebral palsy, paresis of the right arm, and hand tremors were not medically determinable because they were unsupported by medical evidence of record. (AR 17).

The ALJ also considered the Paragraph B criteria set out in the social security disability regulations for evaluating mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.[4] The ALJ found Plaintiff had moderate limitation in understanding,

---

[4] Mental impairments are evaluated using the technique outlined in 20 C.F.R. § 404.1520a. The Commissioner must first evaluate the claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b). If the Commissioner determines that the claimant does have a medically determinable mental impairment, the Commissioner must specify the findings that substantiate the presence of the impairment, and then rate the degree of functional limitation resulting from the impairment. *Id.* The Commissioner considers four areas of functional limitation: ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(4). The degree of limitation is rated as none, mild, moderate, marked, or extreme. *Id.* The Commissioner then determines the severity of the mental impairment. 20 C.F.R. § 404.1520a(d). If the Commissioner rates the degree of limitation as "none" or "mild," the Commissioner will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. *Id.*

remembering, or applying information, and in interacting with others. (AR 18). The ALJ further found that Plaintiff had mild limitations in concentration, persistence, or maintaining pace, and in adapting or managing oneself. Because Plaintiff's mental impairments did not cause at least two marked limitations or one extreme limitation, the Paragraph B criteria were not satisfied.

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence of record. (AR 20).

The ALJ gave some weight to the lay witness statement of Plaintiff's "close friend" or boyfriend because his statements were partially consistent with the other evidence of record indicating that Plaintiff still retained significant functioning, but he had significant motive to support Plaintiff's allegations and not all of his statements were confirmed by other evidence of record. (AR 22).

The ALJ gave significant weight to Dr. King's consultative psychological opinion because it was generally consistent with the evidence of record and based on her examination of Plaintiff. (AR 21).

The ALJ gave some weight to the reviewing state agency physician opinions because they opined that Plaintiff's impairments were non-severe, which was partially consistent with the medical evidence, but the record as a whole indicated Plaintiff has some severe impairments. (AR 21). The ALJ also gave some weight to the reviewing state agency psychologist opinions because they were generally consistent with the record but did not evaluate Plaintiff's functioning under the new "B criteria." (AR 21).

The ALJ found that Plaintiff had the RFC to perform light work limited to simple, routine tasks that could be learned in 30 days or less, with the following non-exertional limitations: the assigned tasks must have minimal change in task as assigned, and no more than occasional, superficial work-related contact with coworkers, supervisors, and the public. (AR 19). The ALJ determined that Plaintiff could not perform her PRW as a housecleaner because she had not performed the job long enough at substantial gainful

activity. (AR 22). The ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy such as garment folder or material distributor. (AR 22–23). The ALJ therefore concluded that Plaintiff was not disabled. (AR 23).

### III.    Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotations and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.

- 14 -

1998) (citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (internal quotations and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV. Discussion

Plaintiff argues that the ALJ committed four errors by excluding materially relevant evidence and requests that this Court remand her case for an immediate award of

benefits. Plaintiff specifically alleges that the ALJ failed to list all of Plaintiff's severe impairments or find that her impairments met or equaled the requirements of the Listing of Impairments. Plaintiff further argues that the ALJ excluded the VE's testimony that she would be unable to maintain competitive employment, that the ALJ failed to adequately develop the record by not obtaining or properly submitting a "Diagnostic Codes" document that Plaintiff delivered, and that the ALJ failed to give adequate weight to the diagnostic findings of multiple treating physicians.

The Court finds that the ALJ did not err by finding that some of Plaintiff's alleged impairments were nonsevere, or that her impairments did not meet or equal a listed impairment. The Court also finds that the ALJ's hypotheticals to the VE included all of the limitations that the ALJ found credible and supported by the record, and that the ALJ did not err by failing to include the VE's testimony that Plaintiff could not maintain employment. Finally, the Court finds that the ALJ did not fail to meet her duty to develop the record. Accordingly, the Court finds that the Commissioner's decision should be affirmed.

A.   Plaintiff's Impairments

Plaintiff alleges that the ALJ failed to include substantial evidence of her impairments, such as her cerebral palsy diagnosis. (Doc. 26 at 2). Plaintiff further contends that her impairments meet or equal the severity requirements for the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner argues that the ALJ reasonably found that not all of Plaintiff's alleged impairments were medically determinable severe impairments at Step Two. (Doc. 28 at 3). The Commissioner further argues that even if the ALJ did err, the error was harmless because Step Two was resolved in Plaintiff's favor and the ALJ continued the sequential evaluation process. *Id.* at 4. And, the Commissioner notes that the ALJ used the broad category of pain and fatigue disorder, which covers the physical impairments Plaintiff alleges, and that Plaintiff has not shown that the ALJ failed to account for her symptoms in later steps of the sequential evaluation process. *Id.* at 5. Finally, the Commissioner argues that

substantial evidence supports the ALJ's finding at Step Three that Plaintiff's impairments do not meet or equal a listing, and that Plaintiff has failed to meet her burden to produce medical evidence establishing otherwise. *Id.* at 5–6. Thus, at issue in this case is whether the ALJ erred in finding that not all of Plaintiff's alleged impairments are severe, and whether Plaintiff's impairments meet or equal the severity of one of the listed impairments.

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The Commissioner follows a five-step sequential evaluation process to determine whether an individual is disabled. 20 C.F.R. § 404.920.

> At step two of the sequential process, the ALJ must conclude whether Plaintiff suffers from a "severe" impairment, one which has more than a slight effect on the claimant's ability to work. To satisfy step two's requirement of a severe impairment, the claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice.

*Orellana v. Astrue*, 547 F. Supp. 2d 1169, 1172 (E.D. Wash. 2008) (citing 20 C.F.R. §§ 404.1508; 416.908). "An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290). Thus, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting SSR 85-28). However, the fact that a claimant has been diagnosed with and treated for a medically determinable impairment does not necessarily mean the impairment is "severe," as defined by the SSR. *See Key v. Heckler*, 754 F.2d 1545, 1549–50 (9th Cir. 1985). To establish severity, the evidence must show the diagnosed

impairment significantly limited the claimant's physical or mental ability to do basic work activities for at least 12 consecutive months. 20 C.F.R. § 416.920(c).

At Step Three, "the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 (pt. A)). "If the claimant's impairment matches or is 'equal' to one of the listed impairments, he qualifies for benefits without further inquiry." *Id.* (citing 20 C.F.R. § 416.920(d)). An impairment cannot meet the criteria of a listing based only on diagnosis; the medically determinable impairment must satisfy all of the criteria of a listing. 20 C.F.R. § 416.925(d). Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing. 20 C.F.R. § 416.925(c)(3).

Here, the ALJ found that Plaintiff had the severe impairments of a chronic pain and fatigue syndrome variously diagnosed, degenerative disc disease of the cervical and lumbar spines characterized as minimal to mild, and a mental impairment variously diagnosed to include depressive disorder and anxiety disorder. (AR 16). The ALJ further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (AR at 17). On appeal, Plaintiff contends that she has a number of additional severe impairments that meet or equal a listed impairment and direct a finding of disability.

First, Plaintiff argues that she meets the listing criteria for cerebral palsy. (Listing 11.00). Plaintiff alleges that she has chronic marked and intermittent severe limitations that cause difficulty walking and coordinating movements due to pain and fatigue, and further argues that the Court should find her disabled prior to the age of 22 due to cerebral palsy and congenital muscoskeletal disorders because these conditions allegedly affected her prior earnings, although she was not diagnosed until 2015. The ALJ found that Plaintiff's alleged cerebral palsy was not medically determinable because it was not supported by the medical evidence.[5] The Court finds no error on this point. The only

---

[5] *See* 20 C.F.R. § 416.921 ("Your impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable

reference to cerebral palsy in the medical record is from Dr. Bamford, who noted "probable mild cerebral palsy." (AR 506). Dr. Bamford further found that Plaintiff had "[n]umerous subjective symptoms with relatively few objective signs" and that she was a hypochondriac who exaggerated for effect. He assessed no specific limitations or recommendations, and there was no plan for further treatment or testing. The fact that Dr. Bamford documented "probable mild cerebral palsy" does not necessarily mean the impairment is "severe," nor are Plaintiff's subjective complaints sufficient to establish the existence of a severe impairment or that an impairment meets the criteria for a listed impairment. *See Lang v. Colvin*, 2014 WL 4827880 at *17 (N.D. Cal. Sept. 26, 2014) (a diagnosis "without any explanation of what practical effects should be expected, is too vague to establish significant limitation of basic work activities"); *Orellana*, 547 F. Supp. 2d at 1172; *Key*, 754 F.2d at 1549–1550; C.F.R. § 416.920(c).

Second, Plaintiff argues that she meets Listing 1.02, major dysfunction of a joint, because of congenital hemihypertrophy, where her right leg is shorter, causing extreme and marked limitations due to pain and fatigue. (Doc. 26 at 9). Plaintiff's diagnosis of congenital hemihypertrophy is not enough to establish the existence of a severe impairment. "The mere diagnosis of an impairment listed in Appendix 1 is not sufficient to sustain a finding of disability." *Key*, 754 F.2d at 1549. The impairment "'must also have the *findings* shown in the Listing of that impairment.'" *Id*. at 1550 (quoting § 404.1525(d)). Here, even if Plaintiff's hemihypertrophy falls under Listing 1.02, Plaintiff fails to point to any evidence in the record showing that she meetings the findings for Listing 1.02. Plaintiff's subjective and conclusory statements that she has pain and fatigue preventing her from performing SGA are wholly insufficient to establish that an impairment is severe or meets a listed impairment.

Third, Plaintiff argues that she meets Listing 1.04, disorder of the spine due to congenital abnormalities, based on her low back pain without sciatica and Bertolotti's

---

clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective  medical evidence from an acceptable medical source.").

syndrome. (Doc. 26 at 9–10). Plaintiff claims these conditions cause back and leg pain and fatigue, and are worse with activity. The ALJ did evaluate Plaintiff's degenerative disc disease under Listing 1.04, but found that Plaintiff's impairment failed to meet or equal the required criteria. (AR 17). The ALJ specifically noted the following:

> In order to meet this listing there must be medical evidence of nerve root compression accompanied by sensory or reflex loss, spinal arachnoiditis confirmed by tissue biopsy or imaging resulting in the need for changes in position or posture more than once every two hours, or lumbar spinal stenosis resulting in inability to ambulate effectively. The applicable regulations provide that, to ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. The regulations provide the following, non-exclusive examples of ineffective ambulation: the inability to walk without the use of a walker, two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to use standard public transportation; the inability to carry out routine ambulatory activities, such as shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The claimant's records provided no objective findings confirming the above criteria. Likewise, the record indicates that the claimant ambulates effectively, contrary to the claimant's allegations she could sometimes walk no more than a "few steps."

(AR 17) (internal citations omitted). Plaintiff does not point to any specific medical evidence demonstrating that she meets the criteria for Listing 1.04, and her subjective pain and fatigue are insufficient to prove otherwise.

Fourth, Plaintiff argues she meets listing 12.00 for mental disorders. (Doc. 26 at 11). Mental impairments are evaluated using the technique outlined in 20 C.F.R. § 404.1520a. The Commissioner must first evaluate the claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b). If the Commissioner determines that the claimant does have a medically determinable mental impairment, the Commissioner must specify the findings that substantiate the presence of the impairment, and then rate the degree of functional limitation resulting from the impairment. *Id*.

Listings for mental disorders are arranged into separate categories. Here, the ALJ

found that Plaintiff had a severe mental impairment variously diagnosed to include depressive disorder and anxiety disorder. The ALJ considered whether Plaintiff's mental impairment met the criteria for Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). Plaintiff suggests that she meets the criteria for Listings 12.04 and 12.15 (trauma and stressor-related disorders) but provides no further explanation or argument on this point.

Listings 12.04, 12.06, and 12.15 each have three paragraphs, designated A, B, and C. To meet the listing, a claimant's mental disorder must satisfy the requirements of both Paragraphs A and B, or the requirements of both Paragraphs A and C. Paragraph A of each listing includes the medical criteria. Paragraph B includes the functional criteria to assess how a claimant's mental disorder limits areas of mental functioning used in a work setting. The Commissioner considers four areas of functional limitation: ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(4). The degree of limitation is rated as none, mild, moderate, marked, or extreme. *Id*. The Commissioner then determines the severity of the mental impairment. 20 C.F.R. § 404.1520a(d). If the Commissioner rates the degree of limitation as "none" or "mild," the Commissioner will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. *Id*.

As noted above, here the ALJ found that Plaintiff did have a medically determinable mental impairment, but that it caused no more than moderate limitations in Plaintiff's functioning under Paragraph B. (AR 16, 18). The ALJ took Plaintiff's subjective complaints into consideration and found that she had moderate limitations in understanding, remembering, or applying information, even though the psychological consultant found Plaintiff had no significant problems with cognitive functioning and Plaintiff's memory was intact. (AR 18). The ALJ also found moderate limitations in interacting with others "out of an abundance of caution" based on Plaintiff's allegations

of anxiety and panic attacks, although the record provided little evidence of significant functional limitations and Plaintiff routinely lived with and interacted with others. The ALJ further found that the Paragraph C criteria[6] were not satisfied because the medical evidence of record did not show such marginal adjustment that Plaintiff had minimal capacity to adapt to changes in the environment or new demands, or that increased demands had led to a deterioration of Plaintiff's functioning. (AR 18–19). The ALJ accounted for Plaintiff's mental impairments in the RFC by limiting Plaintiff to simple, routine tasks with minimal change in task assigned, and no more than occasional superficial contact with coworkers, supervisors, and the public. (AR 19). Plaintiff does not point to any specific evidence in the record demonstrating how her mental impairments meet the criteria under Paragraphs A, B, or C for Listings 12.04, 12.06, or 12.15. Despite limited evidence of Plaintiff's mental impairments or any resulting limitations, the ALJ gave Plaintiff the benefit of the doubt and assessed some mild and moderate limitations and incorporated those limitations into the RFC. Accordingly, the Court finds no error on this issue.

Finally, Plaintiff argues that she meets Listing 14.00 for autoimmune disorders based on her diagnoses of unspecified arthritis, myalgia, myositis, and multiple spinal anomalies, causing pain and fatigue and for which she receives trigger point injections. (Doc. 26 at 12). The ALJ noted that the medical evidence of record provided very little support for Plaintiff's subjective allegations. (AR 20). For example, Plaintiff's autoimmune workups were completely negative, despite Plaintiff's assertion that she had

---

[6] To satisfy the C criteria, the claimant must show: (1) a medically documented history of the mental disorder over a period of at least two years; (2) evidence that the claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial supports, or a highly structured setting to diminish signs and symptoms of the mental disorder; and (3) evidence that, despite diminished signs and symptoms, the claimant has achieved only marginal adjustment. Listing 12.00(G)(2). "Marginal adjustment" means that the claimant's adaptation to the requirements of daily life is fragile and that the claimant has minimal capacity to adapt to changes in environment or to demands not already part of daily life. Listing 12.00(G)(2)(c). The ALJ will consider that a claimant has achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of symptoms and deterioration in functioning, for example if the claimant is unable to function outside of the home without substantial psychosocial supports. *Id.*

been diagnosed with rheumatoid arthritis. Plaintiff also had normal electromyographic studies, her genetic tests were negative for abnormalities, and numerous x-rays and MRIs were negative for any neurological or other significant abnormalities other than some musculoskeletal changes. Again, the Court reiterates that "the claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice." *Orellana*, 547 F. Supp. 2d at 1172. And, the fact that a claimant has been diagnosed with and treated for a medically determinable impairment does not necessarily mean the impairment is "severe." Plaintiff states that she submitted MRI reports showing the presence of a brain lesion and congenital spinal abnormalities and contends that the ALJ "used incorrect interpretations of imaging reports in her false claims that 'no evidence supporting the existence of disabling impairments was submitted,'" (Doc. 29 at 2), but Plaintiff cannot merely substitute her interpretation of the evidence for the ALJ's.

In sum, the crux of Plaintiff's argument on appeal is that the ALJ's findings at Step Two and Step Three are not supported by substantial evidence based on Plaintiff's own interpretation of the medical records. Plaintiff essentially asks the Court to reweigh the evidence more favorably to her, but Plaintiff's alternate interpretation is not enough to assign error to the ALJ's findings. "While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the [ALJ]." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). "When the evidence is susceptible to more than one rational interpretation, and the [ALJ's] conclusion is one such rational interpretation, that interpretation must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). This Court has carefully reviewed the ALJ's decision in this matter, and the ALJ provided a thorough discussion of the medical evidence of record, summarized the findings, and explained why Plaintiff's various impairments were or were not severe, and why they did not meet a listed impairment. Plaintiff contends that the record as a whole provides substantial

evidence of disability. The ALJ found that it did not. It is not up to the reviewing Court to second-guess the ALJ's well-reasoned decision in this matter.

### B.    VE Testimony

The ALJ's non-disability finding resulted from the presentation of a hypothetical RFC to the VE and the VE's testimony regarding Plaintiff's ability to perform other work existing in the national economy. Plaintiff argues that the ALJ ignored the VE's testimony that she would be unable to maintain competitive employment. (Doc. 26 at 2).

At "step five of the five-step sequential inquiry, the burden shifts to the Commissioner to prove that, based on the claimant's residual functional capacity, age, education, and past work experience, she can do other work." *Smolen v. Chater*, 80 F.3d 1273, 1291 (9th Cir. 1996). "If she can, she is not disabled; if she cannot, she is disabled." *Id*. "The Commissioner may carry this burden by 'eliciting the testimony of a vocational expert in response to a hypothetical that sets out all the limitations and restrictions of the claimant.'" *Conlee*, 31 F. Supp. 3d at 1173 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record." *Id*. (citing *Gamer v. Secretary of Health and Human Servs*., 815 F.2d 1275, 1279 (9th Cir. 1987) (hypothetical questions must "set out all of the claimant's impairments")). "'If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value.'" *Id*. (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)). "The ALJ, though, 'is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence.'" *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (quoting *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001)).

Here, Plaintiff contends that she should be found disabled based on the VE's testimony that she was unable to maintain competitive employment. The VE made this statement in response to a hypothetical posed by Plaintiff, wherein Plaintiff alleged that she would have to take more than a week off of work every month due to not feeling well

and would need to rest 50 percent of the time when she was at work. (AR 54). The ALJ found Plaintiff could perform a range of light work limited to simple, routine tasks with no more than occasional, superficial contact with coworkers and the public. (AR 19). The ALJ did not assess any specific limitations regarding Plaintiff's alleged need to take time off of work or rest while at work, and there are no medical opinions recommending limitations due to Plaintiff's alleged impairments. While Plaintiff argues for a different interpretation of the evidence, the Court finds that the ALJ's RFC assessment contains all of the limitations that the ALJ found credible and supported by substantial evidence in the record and is consistent with the restrictions identified in the medical testimony. There is simply no support in the record for the hypothetical Plaintiff posed to the VE, and even on appeal, Plaintiff has not pointed to any *evidence* of functional limitations that would support such restrictions. Accordingly, the ALJ did not err in failing to credit the VE's testimony that Plaintiff would be unable to maintain competitive employment if Plaintiff were required to miss one week of work per month and rest 50 percent of the time while at work.

C. <u>Duty to Develop the Record</u>

Plaintiff alleges that the ALJ failed to adequately develop the record by not obtaining or properly submitting materially relevant evidence that Plaintiff delivered. Plaintiff specifically alleges that a document titled "diagnostic codes" was stamped "received," showing that Plaintiff attempted to submit the evidence, but was missing from the record. (Doc. 26 at 2). Plaintiff attaches this document to her opening brief. *Id.* at 16. It is dated September 8, 2016 and also date-stamped as received by the SSA office on that date, and lists diagnoses for post-traumatic stress disorder, acute, and bipolar disorder, current episode depressed, moderate. Plaintiff contends that this is sufficient to establish that her mental impairments meet the severity and two-year duration requirement for Listing 14.00 because her previous mental health diagnosis in the record was from August 6, 2014. (Doc. 29 at 6).

While it is the claimant's burden to prove that he is disabled, *Valentine*, 574 F.3d

at 689, "the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R. § 416.912. "The ALJ is not a mere umpire at such a proceeding . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). However, "an ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).

Here, the record in question is a one-page document listing mental health diagnostic codes. Contrary to Plaintiff's urging, this document is not sufficient to establish that her mental health conditions of PTSD and bipolar disorder meet the duration and severity requirements of Listing 14.00. To establish the required level of severity, Plaintiff must satisfy the requirements of both the A and B criteria, or the A and C criteria. As explained above, the ALJ found that the Paragraph B criteria were not met because Plaintiff had no more than moderate limitations in functioning, and the Paragraph C criteria were not met because the record did not show that Plaintiff had achieved only marginal adjustment. Thus, even if this document was not included in the record before the ALJ, it would not alter the ALJ's conclusion that Plaintiff's mental health conditions did not meet or equal a listed impairment. Further, the ALJ's decision does not indicate that the ALJ found the record to be ambiguous or insufficient to properly evaluate Plaintiff's mental impairments, nor does the Court find it to be inadequate. Plaintiff's attempt to persuade the Court otherwise is unwarranted.

D.   Medical Testimony

Plaintiff argues that the ALJ failed to give adequate weight to the diagnostic findings of her treating physicians, including evidence of Plaintiff's spinal anomalies, congenital anomalies, pain syndromes, and mental health impairments that could reasonably be expected to cause pain and fatigue, evidence of Dr. Dumont's diagnosis of

arthritis and lower back pain, and evidence of Plaintiff's mental health diagnoses and medications. (Doc. 26 at 3). Plaintiff makes no further argument on this point, and, as noted above, the essence of Plaintiff's argument on appeal is that her own interpretation of the record, rather than the ALJ's, is correct.

Plaintiff's cursory reference to these issues does not warrant further discussion by the Court. "A plaintiff challenging the Commissioner's final decision regarding disability must specifically and directly argue issues in his or her opening brief." *Schopp*, 2014 WL 4722524 at *4. "A plaintiff must also carry his or her burden in establishing how the alleged errors were prejudicial." *Id.* "We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . ." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (internal citation omitted). As indicated by the Ninth Circuit in *Greenwood*, "[j]udges are not like pigs, hunting for truffles buried in briefs." *Id.* (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)). Consequently, the Ninth Circuit has refused to address claims that were only "argue[d] in passing," *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n. 4 (9th Cir. 2010), or that were "bare assertion[s] . . . with no supporting argument," *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079 n.26 (9th Cir. 2008).

Here, because Plaintiff's contention that the ALJ failed to give adequate weight to the diagnostic findings of her treating physicians was not argued with specificity, this argument is waived and the Court declines to address the issue.

## V. Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690. Here, the record contains sufficient substantial evidence to meet this

standard. The Court concludes that the ALJ's findings are supported by substantial evidence and there is no legal basis for reversing or remanding her decision. Therefore, Plaintiff is not entitled to relief.

**VI.    Conclusion**

In light of the foregoing, **IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and close its file on this matter.

Dated this 27th day of August, 2019.

Eric J. Markovich
United States Magistrate Judge